**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-cr-20483-ALTMAN(s)**

**UNITED STATES OF AMERICA**

**vs.**

**AVIN SEETARAM,**

       **Defendant.**
_____ __/

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 288]**

The United States of America files this *Response to Defendant's Motion to Suppress [ECF No. 288]*, and states:

Defendant challenges his pre-arrest statements to federal agents as custodial interrogation that violated his *Miranda* rights. He next challenges confessions to murder during debriefings on the basis that he was plea negotiating. His last challenge is to his confession to murder in front of the Grand Jury, now combining both arguments—that it violated his *Miranda* rights and was pursuant to plea negotiations. First, the "facts" underpinning Defendant's legal arguments are wrong and/ or incomplete and/or out of context. Second, this Court has binding Eleventh Circuit precedent disposing of these claims in the Government's favor.

**MEMORANDUM OF LAW**

**I.      Defendant was not in custody thus triggering *Miranda* warnings pre-arrest.**

On November 18, 2023, the Defendant and his wife drove to FBI headquarters as requested knowing it was for questioning regarding the victim's whereabouts—which by then was unknown to everyone present except Defendant, who helped dispose of the victim in the Everglades. There's

nothing custodial about driving yourself to law enforcement for an interview.[1] An agent spoke with Defendant's wife and other agents escorted Defendant to an interview room and began to question him in an audio and video recorded session without administering *Miranda* warnings. Defendant's wife gave her interviewing agent what appeared then to be certain material information. In the meantime, back in the interview room, agents did not handcuff Defendant. Agents told Defendant his presence and interview was voluntary. *See* Exhibit 1 P.1. These words weigh heavily in any custody analysis. [2]

After suspecting he was not truthful in the interview, Defendant agreed to the agents' proposal of a polygraph examination. Agents gave him the option of doing the polygraph there and then or returning at a later date. Exhibit 1 P. 74. Defendant preferred to return, and the agents advised him that it would take as long to do the examination as it would take his phone download that he previously consented to and which was still in progress. With that, Defendant agreed to remain and take the polygraph. Exhibit 1 P. 75. Agents escorted him outside the building to vape upon Defendant's request. Once back inside, Defendant executed a written *Miranda* waiver (Exhibit 2) and a consent to polygraph (which advisement is similar to *Miranda* warnings. Exhibit 3. Defendant then submitted to a polygraph, which he failed. Agents permitted Defendant to

---

[1] *United States v. Jackson*, 367 F. App'x 55. 57 (11th Cir. 2010); *See also Purvis v. Dugger*, 932, F.2d 1413, 1419 (11th Cir.1991) (individual voluntarily went to police station, was never placed under arrest or restrained during initial interview, did not request a lawyer during the interview or ask to terminate the interview); *Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir.1990) (defendant was not "in custody" for *Miranda* purposes where he consented to a search of his house, voluntarily accompanied police to the stationhouse, and voluntarily remained there).

[2] *United States v. Woodson*, 30 F.4th 1295, 1304 (11th Cir. 2022) ("Most important is the explicit advice" that he was not under arrest, that he was not charged with a crime, and that the conversation was voluntary. "Those words make a big difference…" regardless of whether he was specifically told he was free to leave.).

leave the building, and he and his wife drove away, demonstrating that Defendant always knew he had a vehicle at the FBI office and could have left in the same way that he arrived.

As it turns out, a team of agents was investigating various angles during and after this interview and they came upon information that was inconsistent with what Defendant's wife told her interviewing agent, and what Defendant told his interviewing agents. As a result, the agents wanted to speak with Defendant about the newly discovered information. So, they went to his first floor apartment. The approach and the ensuing interview was "in the familiar and comfortable surroundings" of his home, a factor in weighing coercion or custodial status.[3] As the defense notes, this second request to question him followed his questioning by FBI earlier that day after *Miranda* and after agents did not arrest him. i.e. Defendant knew his rights, knew the agents' statement earlier that day that he was not under arrest was accurate; therefore, he had no reason to believe that this time was different. The ensuing encounter had none of the hallmarks of a custodial situation. The agents were in plain clothes and had holstered firearms[4], but their handcuffs were concealed. They arrived in unmarked vehicles. Agents knocked on the door and asked Defendant if he would answer additional questions, and he agreed to sit in one of the agent's vehicles to do so. The doors remained unlocked. The agents did not handcuff Defendant and told him he was not under arrest. Exhibit 4 P. 2. There's nothing wrong with being interviewed in a police vehicle.[5]

---

[3] *United States v. Matcovich*, 522 F. App'x 850, 852 (11th Cir. 2013) (internal citations omitted). *See also United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)

[4] *See a fortiori United States v. Luna–Encinas*, 603 F.3d 876, 881–882 (11th Cir. 2010) (brandishing of weapons and brief control of the person during the search was insufficient to constitute custody under Miranda.).

[5] *United States v. Woodson*, 30 F.4th at 1305 ("Woodson was not handcuffed during the interview, and he sat in the front passenger seat—not in the back seat, where arrestees are typically placed… Nothing indicates that the vehicle's doors were locked. And … the van featured "none of the trappings of a typical police vehicle"—it had no insignia, radio, cage, bar, or visible switch to its

Defendant even executed a written Consent to Search a vehicle.[6]  In order to execute the consent form, Defendant freely exited the agent's vehicle and entered his apartment to retrieve reading glasses and his phone.  He exited again.  At another point in the interview, he again exited the agent's vehicle and went to the vehicle he consented to and retrieved an electronic tablet to assist him in answering questions.

As part of this interview, an agent advised Defendant that information they had received since his interview earlier that day indicated that he and his wife were not being truthful.  An agent did warn Defendant there might be consequences if he and his wife were lying, including arrest, potentially for them both, which in the case of parents, would leave a child alone.  Lying to a federal agent is a violation of Title 18, United States Code, Section 1001. It is in this context that this exchange occurred.  *See* Exhibit 4. P. 5.  Advising Defendant of a fact is not coercive.[7] After Defendant answered questions, the agents exercised their discretion and did not arrest him or his wife for lying, and Defendant re-entered his apartment and agents left the scene.

On November 21, 2023, agents located the victim's decomposed body in the Everglades.  Cell-site data placed Defendant and a co-defendant in the area of where agents discovered the body.  The agents consulted with the United States Attorney's Office (USAO), and the USAO did

---

lights. Given all these facts, we conclude that a reasonable person in Woodson's position would feel free to terminate the interview and walk away.").

[6] Notably, Defendant does not challenge this consent as coerced.

[7] *United States v. Barfield*, 507 F.2d 53, 56 (5th Cir. 1975) ("With *Miranda* awareness of his rights to remain silent, to have counsel, and his willingness to talk, he had no constitutional right to lie and an officer's admonition to tell the truth, whether based on morals or even misguided notions of statutory prohibitions, does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."); *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994).

not authorize an arrest.  Thereafter, at approximately 3:00 p.m., agents showed up at Defendant's sister's residence to interview him.[8] The approach and everything after was audio recorded. Defendant claims in his motion that he made certain comments indicating that he did not want to continue, or had some hesitation, or agents made promises.  The transcript of what transpired is submitted as Exhibit 5a (approach at Defendant's apartment, car ride, roadside at scene, arrival at FBI headquarters); Exhibit 5b (interview at FBI headquarters).  In these conversations, Defendant makes statements and asks questions about his custody status, going home, or the like.  Defendant points to some of them in support of his argument that he was in custody the whole time requiring *Miranda* warnings.  However, in answer to every unambiguous statement or question, the agents constantly and consistently advised Defendant he was not under arrest, that he was there voluntarily, and that he could continue or not continue to speak with the agents.

The ensuring encounter also had none of the hallmark signs of a custodial situation. The encounter began at his apartment door when family members advised him agents wanted to speak with him.  He exited the residence into the driveway, and agents showed him a photograph of himself and a co-defendant in a video recording from a commercial establishment.  He stated he could not positively place the footage, and an agent told Defendant that they sometimes drive people around to help refresh their recollection. Defendant's family member exclaimed, "You have to help them!" (Exhibit 5a) and Defendant agreed to accompany the agent in an unmarked vehicle. The agent told Defendant they were going on location, and the family member again told Defendant to cooperate with agents.  Defendant entered the agent's vehicle and was not

---

[8] *United States v. Brown*, 441 F.3d at 1348 (Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, " '[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the suspect's home.").

handcuffed.  The agents drove straight to the Everglades. There is nothing inherently coercive about law enforcement driving someone to a crime scene.[9]

The agents and Defendant arrived to the area where cell-site information indicated Defendant was just 20 days earlier. Defendant claims he was surrounded by a hoard of law enforcement at this time.  The truth is that an Evidence Response Team (ERT) truck was on the shoulder of the road, and the victim's remains were in the grass and wooded area far off from the road and were not visible. That's where all but three agents were located.[10]  The three agents were the ones in the vehicle with Defendant, and they pulled over nearly 100 yards away from ERT. The agents and Defendant exited the vehicle and walked in ERT's direction.  Defendant was interviewed about halfway to ERT, and he denied going to the area.  It was at this time that the agents showed Defendant a photograph of the remains that he claims was overly gruesome and coercive (Exhibit 6).[11]  He was not handcuffed.  He was walking around on the side of the road and smoking, and he continued to deny any wrongdoing.  He eventually made incrementally incriminating statements.  At one point, Defendant said he could now smile and cry because "it was off [his] chest."   The USAO still had not authorized an arrest.  In the car, the Defendant

---

[9] This is a far cry from the conduct in *Kaupp v. Texas*, 538 U.S. 626, 631 (2003), where police officers woke an adolescent in the middle of the night with the words "we need to go and talk," took him from his house "in handcuffs, without shoes, dressed only in his underwear in January, placed in a patrol car, driven to the scene of the crime and then to the sheriff's offices, where he was taken into an interrogation room and questioned."

[10] *United States v. Garcia*, 890 F.2d 355, 360–62 (11th Cir. 1989) (finding handcuffed defendant's consent to search home voluntary despite the presence of 14 agents*); See also United States v. Alim*, 256 F. App'x 236, 240 (11th Cir. 2007) (Finally, although there were more officers present during the search of Alim's business than during the search of the defendant's premises in *Garcia*, we do not view this as sufficient to affect the outcome of this case.).

[11] "Showing a ... suspect photographs of the ... victim is not inherently coercive police conduct...." *United States v. Sanchez*, 614 F.3d 876, 885 (8th Cir. 2010).

continued to implicate himself. One of the details involved a storage unit, and when the agent asked its location, Defendant said, "If you guys want, I can take you guys there, I got full access there." They all left the scene.

En route, Defendant asked if he could sleep at home with his kids, and an agent said he could make no promises. Agents made a decision to drive to headquarters to get a formal statement on audio/ video recordings. They told Defendant of this decision, and he asked to go by his house and/or see family prior to going to headquarters. Agents told him they would like to get a recorded statement, and when he asked, agents told him he was not under arrest. They also told him they would make arrangements for family to meet him at headquarters. He thanked the agents for their offer to tell the AUSA he was being helpful. Defendant and the agents continued to talk about the case while driving to headquarters.

Once at FBI headquarters, agents walked him into an interview room. He was not handcuffed. He asked about seeing his family, and agents, again, said they did not, and could not, promise him anything. Any time Defendant asked about his kids or his future, the agents reiterated there were no promises, and it was not up to them. Agents said they would get him an answer as soon as possible as to whether he could go home and see his family. The agents' reference to getting him an answer as soon as possible was because agents were waiting on the USAO's arrest authorization. One significant exchange after a break in the interview process is detailed below:

Agent 1: Okay, and you still want to talk to us and all that, right?

Defendant: [raises both hands]

Agent 1: You know that already you're not under arrest, you're free to leave, we just want to talk to you about this?

Defendant: You told me, you do - you told me straight up that I'm ah- that you don't know if going home or not

Agent 1: [overlapping] You're good with it?

Agent 2: Correct

Agent 1: That's correct, yeah, but you're not under arrest, but we don't know if you're going to get charged tonight or not, that's the truth. So… That's the truth, we don't know if, we just talked to the prosecutor and she's making some phone calls, but you're, you're free to leave, but we just want to ask you - -

Defendant: But if I leave you guys are gonna arrest me as soon as I walk out [UI]

Agent 2: No

Agent 1: No, that's not true

Defendant: [laughs]

Agent 1: That's, that's not true. That's not true

Defendant: I rather, guess what, I rather let it come off my chest

Agent 2: Okay

Agent 1: If that's what you want to do, then let's - -

Defendant: I rather let it come off my chest

Agent 1: So you want to keep talking to us then?

Defendant: Yes

Agent 1: Alright let's do it

The USAO's arrest authorization came in during the interview, and the agents told Defendant he was under arrest, they permissibly reiterated that they would make his cooperation known to the prosecution,[12] but that they had to read him his *Miranda* rights prior to continuing. He could not wait to continue speaking (Exhibit 5b):

---

[12] *United States v. Willix*, 723 F. App'x 908, 912 (11th Cir. 2018) (During the suppression hearing, two of the DEA agents that interviewed Willix testified that while they told Willix they would convey the truthfulness of his information to the prosecutor, they did not promise that his

Agent: … so, we're gonna go over some questions with you, you're gonna read them, if – if you agree with still wanting to talk to us, um, we're gonna see if you still want to go to [the storage unit]…

Defendant: [overlapping] Let's go

Until he was told he was under arrest, Defendant thought he was going home:

Defendant: So, I'm not going home tonight?

Agent: No

The agents then read Defendant his *Miranda* rights (now the second time he'd heard and waived them plus the similar advice in the consent to polygraph), and he executed a written waiver (Exhibit 7). As part of his voluntary, post-*Miranda* statement, agents asked if he still would take them to the storage unit, and he agreed. He also took them to another material location. There is nothing close to the prohibited "ask questions first, Mirandize later" bait and switch, as Defendant suggests, under *Missouri v. Seibert*, 542 U.S. 600 (2004). *See reasoning in United States v. Salman*, 286 F. Supp. 3d 1325, 1346 (M.D. Fla. 2018).

As demonstrated above, the agents did nothing coercive or inducing under the law. There remains, of course, the totality of the circumstances review. Whether Defendant was in custody prior to his formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would

cooperation would yield any benefit. Furthermore, Willix himself admitted that the agents did not make any explicit promises to him, but that based on his past experience, he felt like if he cooperated it would help reduce his sentence. The evidence supports the district court's finding that agents did not make any promises to Willix in exchange for his cooperation. We therefore affirm the denial of Willix's motion to suppress his post-arrest statements.) *See also United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary." (collecting cases)); *see also United States v. Quinn*, 123 F.3d 1415, 1424 (11th Cir. 1997) ("Discussions of realistic penalties are normally insufficient to preclude free choice." (cleaned up)).

not feel free to leave." *United States v. Brown*, 441 F.3d at 1347 internal citations omitted and cleaned up). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. *Id.* "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.* (emphasis added). To be sure, a defendant's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, [does] not automatically create a custodial situation." *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000).

## II.    The debriefings were not immunized or in furtherance of plea negotiation

The Government does not intend to use Defendant's statements made in three debriefings in its case-in-chief at trial.[13]  However, Defendant seems to argue that his Grand Jury testimony that followed days later was the product of continued plea negotiations that began in these debriefings; therefore, his arguments about *Kastigar* and Fed. R. Evid. 410 (statements made during plea negotiations) are addressed herein.

As a preliminary matter, Defendant has placed at issue in his motion his subjective belief that he was plea negotiating with the Government.  As permitted by court order [ECF No. 310], the Government adopts and incorporates by reference herein its position as set forth in its *Emergency Motion to Declare Waiver of Attorney-Client Privilege or To Strike The Motion to*

---

[13] The Government intends to use any portion of these statements in cross-examining Defendant, and/or as a prior consistent statement and/or to rebut any evidence presented, examinations or arguments made that the government or its agents fed the information to Defendant to regurgitate at Grand Jury or at trial.  As he must in claiming these were plea negotiations, the defense does not claim these statements were involuntary.

*Suppress* [ECF No. 308].[14]

Agents arrested Defendant November 21, 2023, subsequent to the USAO's authorization. A Criminal Complaint followed.  Defendant privately retained counsel, who asked the AUSA if Defendant could debrief, and a debriefing date was set. There were no other witnesses to this conversation.  This debriefing, and two subsequent debriefing, occurred prior to formal charges in an indictment after a grand jury presentation.  They were not done pursuant to a *Kastigar* letter or any oral immunity agreement. i.e. there were no requests or offers of immunity.[15]

> AUSA: Prior to your testimony today, the federal government has not promised you any sort of immunity, correct?

> Defendant: Yes

(Exhibit 8 P. 6).

In fact, as current counsel for Defendant seems to well know this jurisdiction's *Kastigar* letter, he must know that it specifically excludes crimes of violence.  Then counsel for Defendant knew that, and he and the AUSA had specific discussions that no *Kastigar* letter would issue. There were no additional witnesses to these conversations. At the debrief(s), the AUSA advised Defendant, in the presence of his then attorney, and agents that there was no immunity and that she was there to listen to what Defendant had to say.  The AUSA did explain the process related to cooperation and

---

[14] In addition to the case law cited therein, the Government notes  *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1248-49 (11th Cir. 2020) (holding that "a party waives the attorney-client privilege when that party places privileged information in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party") (quotation omitted).

[15] The Defendant cites *Pielago* to support his contention that the statements he made to the Government during debriefs constitute plea discussions within Federal Rule of Evidence 410(a)(5). (Motion at 14). However, *Pielago* does not discuss this Rule at all. In fact, *Pielago* focuses on a defendant who – unlike the Defendant in this case – spoke with the Government pursuant to a proffer agreement. *Pielago*, 135 F.3d at 709. The Government used the statements that the defendant in *Pielago* made to support the indictment of another defendant, and the Court deemed this derivative use to be permissible. *Id*. at 711.

sentence reduction, but never engaged in plea negotiations.  Instead, in fact, the AUSA told Defendant he was getting charged with murder and that there were no inducements or promises to confess to murder. *See United States v. Merrill*, 685 F.3d at 1013 (There were no pending charges against Merrill when the discussion occurred, and the general discussions of leniency did not transform Merrill's meeting with the prosecutor and federal agents into plea negotiations.). *See also United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995) (holding that a defendant's voluntary statements to improve his situation before plea negotiations have begun or after a plea agreement is reached are not statements made in the course of plea discussions under Rule 410).

Defendant claims these statements are inadmissible as made in furtherance of plea discussions per Fed. R. Crim. P. 11(f).  However, there were no plea negotiations, as then counsel for Defendant would testify, and as made clear, on the record, before the Grand Jury.

"To determine whether a discussion should be characterized as a plea negotiation the trial court must determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." *Hogan v. United States*, 550 F. App'x 756, 758–59 (11th Cir. 2013) citing *United States v. Merrill*, 685 F.3d 1002, 1013 (11th Cir.2012) (internal quotation marks omitted). However, not every discussion between the accused and the Government is a plea negotiation. *United States v. Robertson*, 582 F.2d 1356, 1365-69 (5th Cir. 1978) (the cooperation of an arrested person often prompted by a desire for leniency for himself or others does not constitute plea negotiations, and a bargained confession, without more, is not a plea negotiation). This circuit has held that such subjective expectations are unreasonable where the Government does not make any firm offers or specific promises. *Hogan*, 550 Fed. App'x. at 759. Even having general discussions about leniency has been found not to render subjective

expectations reasonable. *United States v. Merrill,* 685 F.3d at 1013. More to the point, the absence of such a proffer/ *Kastigar* agreement undercuts Defendant's argument that he was engaging in plea negotiations.

In determining whether a discussion is characterized as an inadmissible plea negotiation, *Robertson* directs courts to carefully consider the totality of the circumstances with each case turning on its facts, keeping in focus the purpose of encouraging and protecting a free plea dialogue between the accused and the Government. *Robertson*, 582 F.2d. at 1366. The court noted that given this purpose, the initial inquiry must focus on the accused's perceptions of the discussion, in context. *Robertson* cautioned, however, that in considering the accused's subjective perception, his subsequent account of his prior mental impression is not to be given sole determinative weight, or else every confession would be subject to challenge. In weighing the accused's subjective belief in the two-tiered analysis and consider, *Robertson* cautioned that where "the record does not disclose a clear expression of a subjective intent on the part of the accused to pursue plea negotiations, the accused's after the fact expressions of his intent must be more carefully evaluated," and the court "must focus searchingly on the record to determine whether the accused reasonably had such a subjective intent, examining all of the objective circumstances," and thus the "objective record must establish that the accused's statements were made in a reasonable belief that he was negotiating a plea agreement," *Id*. at 1367.

Two cases, *Merrill* and *Hogan*, *supra*, bear expounding.  Prosecutors served Merrill with a subpoena to testify before a grand jury investigating whether a company in which he was invested and heavily involved in its operations had unlawfully sold ammunition from a prohibited source to the Government. In preparation for his testimony, Merrill voluntarily met with the AUSA and law enforcement agents. When the interview became accusatory, he was advised that he had the

right to leave, to obtain counsel, or to stay and discuss certain emails the Government was showing him.  Further, he was told he could face charges. He also was told that if he cooperated, the Government could ask for a reduction in his sentence and if he pleaded guilty, the Government would recommend leniency, but the discussions about leniency were general in nature. He stayed and made incriminating statements. The *Merrill* court held that these statements were not subject to suppression under Rule 410 or Rule 11(f), because even if Merrill had a subjective expectation to negotiate a plea, the expectation was unreasonable since there were no charges pending against him, he was told he was free to stop the interview and obtain a lawyer and he declined to do so, and any statements about leniency were general in nature. *United States v. Merrill*, 685 F.3d at 1013 citing *United States v. Posey*, 611 F.2d 1389, 1390-91 (5th Cir. 1980) (The "statement that [the agent] would bring [the defendant]'s cooperation to the attention of the prosecutor and the court did not give [the defendant] a reasonable expectation that he was negotiating a bargain. Rather it is the antithesis of a bargained plea.").

In *Hogan*, the Eleventh Circuit rejected the defendant's contention that his statements were excludable under Rule 410 and Rule 11(f), holding that his own statements reflected that he never expressed a desire to plead guilty, "which demonstrates that he did not have a subjective expectation to negotiate a plea at the debriefing." *Id*. citing *United States v. Merrill*, 685 F.3d at 1013. The *Hogan* court also held that, even if Hogan had the subjective expectation to negotiate a plea, the subjective expectation was not reasonable because he voluntarily participated in the debriefing and understood that he was not being promised any benefit for his cooperation and there was no firm plea offer from the Government. *Id. See also United States v. Morrow*, No. 1:15-CR-458-LMM/AJB, 2016 WL 7192150, at *6 (N.D. Ga. Nov. 4, 2016), report and recommendation adopted, No. 1:15-CR-0458-LMM, 2016 WL 7217221 (N.D. Ga. Dec. 12, 2016) (considering

various cases, including *Hogan* and *Merrill*, that here was no evidence that Morrow's statements pursuant to a Target Letter were intended to be off-the-record or that they were subject to a proffer letter, nor was there any discussion of cooperation, the Sentencing Guidelines or their application, or the like, that would suggest that Morrow's statements were made in anticipation of a future benefit.).[16]

### III.     Grand Jury Confession

After Defendant debriefed three times with his lawyer present, the AUSA, then counsel for Defendant, and Defendant agreed that that Defendant would confession before the Grand Jury without immunity or any promises.  Defendant now asserts that he thought he was plea bargaining all along, and that his *Miranda* warnings before the Grand Jury were insufficient for failure to advise him that he could stop questioning at any time.[17]

---

[16] For a comprehensive review of the evidence presented at the hearing, legal authority relied upon and the rationale, the Government direct this Court to then US Magistrate Judge Robin S. Rosenbaum's *Report and Recommendation* found at *Hogan v. United States*, No. 09-81530-CIV, 2012 WL 12892371, at *31 (S.D. Fla. Feb. 17, 2012), report and recommendation adopted, No. 09-81530-CIV, 2012 WL 12892217 (S.D. Fla. Mar. 29, 2012).

[17] He also asserts that the Government improperly narrowed his *Miranda* rights by only telling him he could refuse to answer questions that incriminated him.  The Government does not dedicate precious space here expounding on the right not to incriminate oneself, as it is universally known, nor to set out all the cases that specify that an accused only has a right before the Grand Jury to refuse to answer questions that are incriminatory. That said, one example:  *United States v. Gaddy*, 894 F.2d 1307, 1314 (11th Cir. 1990) citing *United States v. Mandujano*, 425 U.S. 564, 572 (1976), where the Supreme Court declined to accord a grand jury witness the same rights as a person in police custody. "While [a person in police custody] has an absolute right to refuse to answer any question, [a witness before a grand jury] "has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim." *United States v. Mandujano*, 425 U.S. at 581. "The Fifth Amendment does not preclude a witness from voluntarily offering self-incriminating testimony, however." *Gaddy*, 894 F. 2d at 1314.

As a threshold matter, courts have not held that *Miranda* warnings are required when a defendant testifies before a federal grand jury. *See United States v. Olmeda*, 839 F.2d 1433, 1435 (11th Cir. 1988) (noting that the United States Supreme Court has not decided whether "the grand jury setting presents coercive elements which compel witnesses to incriminate themselves . . . [or] whether any Fifth Amendment warnings whatever are constitutionally required for grand jury witnesses") (quoting *United States v. Washington*, 431 U.S. 181, 186 (1977) (alteration in original). The constitutional guarantee is only that the witness has not been compelled to give self-incriminating testimony. *United States v. Washington*, 431 U.S. at 186. The test is whether, considering the totality of circumstances, the free will of the witness was overborne. *Id.* Here, it was not as, even as Defendant admits, he was there voluntarily supposedly in furtherance of plea negotiations. Defendant was there, as he acknowledged on the record, without a subpoena compelling him to be there.

However, even if the warnings were required, *Miranda* only requires the following warnings: (1) "the person must be warned that he has a right to remain silent;" (2) "that any statement he does make may be used as evidence against him;" and (3) "that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Defendant agrees that the AUSA advised him of all these rights. Defendant's complaint that the AUSA did not inform him that he had the right to stop answering questions at any time during the proceeding does not invalidate *Miranda* warnings.

First, the United States Supreme Court and the Eleventh Circuit have explained time and again that criminal defendants aren't entitled to a word-for-word match between the *Miranda* warnings they receive and the ones set forth in the opinion. *Florida v. Powell*, 559 U.S. 50, 60 (2010); *see also United States v. Street*, 472 F.3d 1298, 1311 (11th Cir. 2006) ("[T]he rigidity of

*Miranda* does not extend to the precise formulation of the warnings given a criminal defendant and that no talismanic incantation is required to satisfy its strictures" (cleaned up)).  Indeed, law enforcement's dutiful reading of *Miranda* warnings in a defendant's native language aren't undone by minor ambiguities or misstatements in those warnings.  *See United States v. Youte*, 769 F. App'x 685, 688 (11th Cir. 2019) (finding that a law enforcement agent provided adequate *Miranda* warnings in Creole to a defendant, despite an "inelegant translation").

Second, the warnings that the AUSA provided do advise him that he had the right to stop answering questions at any time.  The AUSA advised Defendant that he had a right to consult with his attorney who was sitting right outside the grand jury room. See Exhibit 8. P.3.  How else could Defendant consult with his attorney sitting right outside the room unless he stopped the proceeding?[18]

Defendant also claims that these were extensions of plea negotiations commencing during debriefings, previously discussed.  As to his grand jury testimony, Defendant adds that AUSA all but said it was a plea negotiation.  This is not the case.  The AUSA advised Defendant on the record that she was going to charge him with murder (Exhibit 8, P.3 and P.5.), and asked whether, "[a]s a result of [his] cooperation in this federal investigation, [he was] hoping to receive some

---

[18] For what it's worth, Defendant also argues that his "cognitive limitations" and "neurocognitive deficits" affected his ability to knowingly and voluntarily waive his *Miranda* rights.  As of this filing, a doctor brought in by the Government has attempted to conduct a competency evaluation in furtherance of the scheduled Competency Hearing.  Defendant refused to engage in testing related to his competency to waive his *Miranda* rights and wanted his attorney present.  So much for not understanding the importance of *Miranda* or the role of a lawyer.  The Government broached this roadblock with counsel, who advised that his doctor did not evaluate Defendant for competency to waive *Miranda*.  The Government noted that counsel cited the doctor's draft report repeatedly in support of attacks on Defendant's ability to waive *Miranda*.  Counsel said he would instruct his client to not engage in that examination until counsel could speak to the doctor.  Since the Defendant wishes to save for another day the question of his competency to waive *Miranda*, the Government moves to strike arguments in this motion supported by an undisclosed, draft report and a refusal to engage in Court ordered competency testing.

kind of benefit (Exhibit 8, P. 5).  She asked whether Defendant was "providing testimony today with the hopes of entering into an agreement with the government for a recommendation to a federal judge regarding these uncharged crimes (Exhibit 8 P. 5.)  The AUSA confirmed on the record Defendant's understanding that any sentence given in a federal case is up to the sole discretion of the federal judge (Exhibit 8 P.5).  Almost within the same breath, the AUSA asked, "Prior to your testimony today, the federal government has not promised you anything, correct?" (Exhibit 8 P.6) Defendant answered in the affirmative.  Defendant all but admitted that there were no plea negotiations afoot under *Robertson*, *Hogan*, and *Merrill*, *supra*., either at debriefings or the Grand Jury.

## IV.  Perjury and Admissibility of the Statement Regardless

Defendant has written letter(s), in his own hand, wherein he states that what he told the grand jury was a lie.  "It is well established that a criminal defendant's right to testify does not include the right to commit perjury."  *United States v. Veal*, 153 F.3d 1233, 1240 (11th Cir. 1998). "It is [also] well established that a defendant cannot immunize acts of perjury through suppression of false statements that were taken in violation of the defendant's constitutional rights.  *Hogan v. United States*, No. 09-81530-CIV, 2012 WL 12892371, at *31 (S.D. Fla. Feb. 17, 2012), report and recommendation adopted, No. 09-81530-CIV, 2012 WL 12892217 (S.D. Fla. Mar. 29, 2012).


Respectfully submitted,

JASON A. REDING- QUIÑONES
UNITED STATES ATTORNEY


By:   */s/ Michael E. Gilfarb*
Michael E. Gilfarb
Assistant United States Attorney
Fla. Bar. No. 957836

99 N.E. 4th Street
Miami, FL 33132-2111

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 30, 2025, I served a copy upon all counsel of record using CM/ECF.

By:   *s/Michael E. Gilfarb*
Michael E. Gilfarb
Assistant United States Attorney